**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **TOWNE PARK, LLC,** | |
| **Plaintiff,** | **Civil Action No. _____** |
| **v.** | |
| **PRO PARK, INC.  (d/b/a Propark America),** **RUDY TOUVELL,** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff Towne Park, LLC ("Towne Park" or the "Company"), by and through its undersigned counsel, hereby brings the following Complaint seeking injunctive relief and other remedies against Defendants Pro Park, Inc. (d/b/a Propark America ("Propark")), as well as Rudy Touvell ("Touvell"), and avers as follows:

## PRELIMINARY STATEMENT

1.      This action arises from Touvell's resignation from Towne Park to join a direct competitor, Propark, as well as Propark's decision to hire Touvell despite knowing about the Business Protection Agreement ("BPA") that he executed with Towne Park.

2.      Until recently, Touvell worked as a Vice President of Business Development responsible for managing Towne Park's client relationships and sales in the healthcare sector.  In this position, he reported to Towne Park's Senior Vice President of Healthcare and was second-in-command over Towne Park's nationwide healthcare business, which generated approximately 1/3 of Towne Park's total revenue in fiscal year 2018.  Given his significant responsibilities,

Touvell enjoyed unfettered access to the Company's confidential business information, and used the resources provided to him by Towne Park to build strong relationships with his assigned clients.

3.      On August 12, 2019, Touvell announced that he would be resigning from Towne Park, effective August 23, 2019.  Touvell also confirmed that he accepted a position with Propark, in which he would be the Senior Vice President leading Propark's nationwide healthcare business.  Touvell's employment with Propark under those circumstances puts him in breach of his BPA, and will likely harm Towne Park in its efforts to compete with Propark.

4.      Propark knew about the contractual commitments that Towne Park executives like Touvell made in their BPAs, but it hired him anyway.  Just four months ago, Propark hired Towne Park's Vice President of Operations, John Reimers ("Reimers"), to be their Chief Operating Officer ("COO"), notwithstanding Towne Park giving them notice of his BPA.  Since then, Propark has not only hired Touvell, but also Towne Park's Manager of Sales and Growth Analytics, Brenda Freije ("Freije"), who resigned from Towne Park on the same day as Touvell and is also subject to post-employment restrictions under a BPA.

5.      Towne Park hereby seeks preliminary and permanent injunctive relief against Propark and Touvell to enforce the terms of his BPA, halt Propark's unlawful conduct, and protect its confidential information and client goodwill.

6.      Towne Park also seeks monetary damages, to the extent they are available, to compensate it for losses suffered as a result of Defendants' unlawful conduct.

## THE PARTIES

7.      Towne Park is incorporated in Maryland and currently has its principal place of business in Conshohocken, Pennsylvania.

8.     Propark is incorporated in Connecticut and has its principal place of business in Hartford, Connecticut.

9.     Rudy Touvell is an individual and a citizen of the State of Ohio residing in Pickerington, Ohio.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as diversity of citizenship exists and the amount in controversy, including the value of the injunctive relief sought, exceeds $75,000.00.

11.     Personal jurisdiction and venue is proper in this Court because Touvell agreed in his BPA that he "consent[s] to the exclusive jurisdiction of the state and federal courts located in Maryland for the resolution of any dispute regarding or arising out of this Agreement," and Towne Park's tortious interference claim against Propark concerns the breach of Touvell's BPA. *See* Touvell's BPA at § 18, attached as Exhibit A.

12.     Personal jurisdiction over Propark is also proper under Maryland's long-arm statute, Md. Code. Ann., Cts. & Jud. Proc. §6-103(b)(1) and (b)(3), because Propark performed actions in the State of Maryland.

## FACTUAL ALLEGATIONS

**A.     Towne Park Is Engaged in the Highly Competitive Parking Services and Hospitality Business.**

13.     Towne Park is engaged in the business of professional parking management and consultant services, as well as other ancillary services, including but not limited to hospital parking, hotel valet parking, event parking, shuttle transportation, bellhop service, concierge service, remote parking management, door service, greeter service, patient escorts, and self-parking management (collectively, referred to here as "Parking and Hospitality Services").

14.     As an industry leader that has been in the Parking and Hospitality services business since 1988, Towne Park's clients include premier hotel brands and healthcare facilities in over 1,000 locations across the United States.

15.     In the Parking and Hospitality services market, Towne Park competes with dozens of different companies across the country, ranging from large corporations operating on a national scale to local mom-and-pop valet parking businesses (which is how Towne Park started).

16.     Cultivating client goodwill and loyalty is critical for Towne Park to maintain its current clients and to gain new clients, especially because a significant portion of the Company's new clients come from existing client referrals or positive client testimonials.

17.     Towne Park expects and depends on its employees to develop strong relationships with the Company's clients. To that end, Towne Park provides its client-facing employees, like Touvell, with several resources to ensure they have the tools necessary to build and maintain productive client relationships.

18.     For example, Towne Park trains its client-facing employees on how to provide exceptional client service that meets the Company's high standards.

19.     Towne Park also retains third-party vendors to conduct client satisfaction surveys and "secret shopper" reviews at randomized client locations to ensure that Towne Park's employees in the field are meeting its client's expectations.

20.     The data collected from those surveys and reviews give Towne Park's client-facing employees vital information that they can use to address any client issues or concerns proactively and strengthen the client relationship.  This customer satisfaction data is confidential and only shared with managerial and/or client-facing employees on a need-to-know basis.

21.     Towne Park also reimburses its client-facing employees for reasonable expenses they incur at their discretion to build relationships with their assigned clients, including reimbursement for travel and/or meals to meet with client contacts in person.

22.     Besides providing exceptional client service, Towne Park also differentiates itself from its competitors by leveraging its experience and position as a leader in the industry to offer highly competitive prices and contracts for its Parking and Hospitality Services.

23.     Unlike other companies in the industry, Towne Park does not take a "once-size-fits-all" approach to pricing its services.  Instead, Towne Park utilizes proprietary pricing and forecasting methodologies that have been developed and refined by Towne Park over several years.

24.     Using those models, Towne Park is able to consider all of the relevant factors of a client engagement and identify ways to lower the cost to the client while maximizing Towne Park's profit.

25.     The prices and contracts that Towne Park offers to its clients are the product of pricing and forecasting methodologies and strategies that Towne Park has developed and refined over 30 years in the industry.

26.     Likewise, Towne Park's actual prices and contract terms are also confidential, as such information is not publicly available.  In fact, Towne Park's service proposals and contracts with clients include confidentiality provisions to prevent disclosure of pricing and terms.

27.     If a competitor learned how to recreate or implement Towne Park's pricing and forecasting methodologies, or learned about the specific prices and contract terms that Towne Park has with its existing clients, it would irreparably damage Towne Park's business.

28.     To protect its client relationships and its confidential information, Towne Park requires its key employees to execute BPAs.

29.     At the termination of employment, Towne Park also requires its employees to return, and not retain copies of, all correspondence files, business files, customer and prospect lists, price lists, product lists, software, manuals, technical data, forecasts, budgets, notes and other material that contain any of this information and other similar information upon separation from employment.

**B.      Towne Park's Healthcare Business Is Critical to Its Bottom-Line.**

30.     Towne Park categorizes its clients into three broad groups:  (1) "commercial," which includes parking garages, commercial buildings, residential buildings, and airports; (2) "hospitality," which includes hotels and restaurants; and (3) "healthcare," which includes hospitals and other healthcare facilities.

31.     Towne Park's healthcare business generated approximately 1/3 of Towne Park's total revenue in fiscal year 2018, and the Company has identified the healthcare sector as one of its biggest opportunities for growth.

32.     Towne Park's experience with servicing healthcare clients over the past 25 years also gives the Company a distinct advantage in this industry.

33.     As one of the first Parking and Hospitality service providers to partner with healthcare clients, Towne Park has developed and fine-tuned its healthcare operations over several years.  In contrast, many of Towne Park's competitors, such as Propark, are relatively new to the healthcare sector and are trying to catch up to Towne Park.

34.     One distinct element of the healthcare business is the prevalence of Group Purchasing Organizations ("GPOs") in the industry.  Specifically, GPOs are entities that assist healthcare providers by aggregating purchasing volume from its members and using that

leverage to negotiate discounts with manufacturers or third-party service vendors like Towne

Park.  Approximately 95% of all hospitals in the United States are affiliated with a select number

of national GPOs.

35.     Towne Park currently has two GPO clients who together represent over 5,500

hospitals nationwide.  For those GPOs, Towne Park has negotiated contracts to provide each

GPO's members with certain pricing options or tiers.  While the individual hospitals are free to

reject the prices that Towne Park negotiated with the GPOs, Towne Park's relationship with the

GPOs gives the Company a significant advantage towards winning business with the GPOs'

members.

36.     Approximately 1/3 of Towne Park's clients in the healthcare sector are hospitals

affiliated with the two GPO clients.  It is imperative for Towne Park to maintain a good

relationship with its GPO clients.

**C.      Touvell Had Significant Sales and Operational Responsibilities That Gave Him
        Access to Towne Park's Confidential Information and Key Healthcare Clients.**

37.     Towne Park hired Touvell in January 2016 to be a Vice President of Business

Development after Towne Park had acquired the company Touvell worked for at the time,

Parking Solutions, Inc.  As the Vice President of Business Development, his responsibilities

included client relationship management and business growth in connection with Towne Park's

national healthcare services platform.

38.     In April 2018, Touvell took on the position of Vice President of Operations, in

which he had direct accountability for Towne Park's business in the Great Lakes Region and was

responsible for the region's performance for financial, guest/patient satisfaction, client retention,

employment practices and business development objectives.

39.     Touvell returned to his former position as Vice President of Business Development of Towne Park's healthcare business a few months later, earning a salary of $155,000 plus incentive compensation.  He stayed in that position until his resignation from Towne Park.

40.     Starting in October 2018, Touvell reported to Towne Park's Senior Vice President of Healthcare, Daryl Stilley ("Stilley").  The other two individuals reporting to Stilley at the time were Regional Managers who were responsible for overseeing all sales efforts and client relationships for Towne Park's healthcare business in their assigned territories, which were the West and Central Regions.

41.     Touvell was assigned the East Region and had the same responsibilities as the two Regional Managers reporting to Stilley.  The East Region consists of the following states plus Washington D.C.: Maine, Vermont, New Hampshire, Rhode Island, Massachusetts, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, West Virginia, Ohio, Virginia, North Carolina, South Carolina, Georgia, Alabama, Mississippi, and Florida.

42.     Touvell was responsible for managing the relationship for all of Towne Park's healthcare clients and overseeing the sales efforts for current and potential healthcare clients in those states.  In that regard, his specific job duties included:

    a.   Developing client service objectives and establishing clear metrics for managing the client service department;

    b.   Developing proactive plans to improve client experience in all touch points;

    c.   Identifying new business opportunities and partnerships, and recommending sales strategies for improvement based on market research and competitor analysis;

    d.   Executing corporate strategic planning, sales strategy and forecasting, and budgeting;

    e.   Managing the business development process, with special attention given to new opportunity identification, screening, forecasting, qualifying, pursuit and capture of such opportunities;

    f.   Ensuring client retention by establishing relationships with client senior level management and consulting with the client and internal organizational groups for new insights to improve Towne Park's services to the client;

    g.   Soliciting and communicating the client's wants and needs to Towne Park's division management and staff; and

    h.   Working with multiple departments to evaluate new areas of business and new market opportunities for Towne Park.

43.    In addition to his regional responsibilities, Touvell was also responsible (as Vice President, Business Development) for managing Towne Park's client relationship with two national GPO clients.

44.    Touvell was the face of Towne Park for the key decision-makers at those GPOs, and he was instrumental in leading the negotiation for Towne Park's contract with one of those GPO clients (which are located in North Carolina and Tennessee).

45.    All Towne Park sales or operations employees working with any healthcare client affiliated with those GPOs were required to involve Touvell in any negotiations with or key decisions related to those clients.  This was so he could ensure that Towne Park was meeting the expectations of the GPO clients.

46.    Touvell therefore frequently traveled outside of the East Region to states such as Arizona, California, Illinois, Michigan, Tennessee, and Texas to visit key decision-makers not only for his assigned GPO clients, but also Towne Park's healthcare clients affiliated with those GPOs.

47.    Overall, the clients Touvell was responsible for managing generated several millions of dollars in revenue for Towne Park.

48.     Consistent with his significant responsibilities, Touvell was privy to confidential information and documents, including but not limited to:

    a.  Lists and data showing pricing and contract terms for all of Towne Park's healthcare clients nationwide;

    b.  Pricing and contract terms for Towne Park's two GPO clients, as well as insight on the key decision-makers for those GPOs which he gained through his employment with Towne Park;

    c.  Towne Park's pricing and forecasting methodologies;

    d.  Current and future sales plans, strategies, and target markets and clients;

    e.  Data on Towne Park's current and projected revenue for its healthcare clients nationwide;

    f.  Data from client surveys and reviews for all of Towne Park's healthcare clients nationwide;

    g.  Towne Park's operational strategies specific to the healthcare business;

    h.  Towne Park's operational capabilities specific to the healthcare business, including information on Towne Park's opportunities for improvement; and

    i.  Internal performance evaluations and rankings for employees in sales and operations, including knowledge of Towne Park employees with key client relationships.

49.     Touvell was also hand-picked by Towne Park's Executive Leadership Team to participate in a new Company-wide initiative called "Project One," which was announced around June of this year.  The goal of Project One (which is ongoing) is to identify Towne Park's 50 most important clients throughout the Company and then work on strategies to improve Towne Park's relationships and grow its business with those clients.

50.     Through his involvement in Project One, Touvell received confidential information on Towne Park's 50 most important clients spanning the healthcare, commercial, and hospitality businesses.  This confidential information included essentially all of the categories of confidential information and data noted above for Towne Park's healthcare clients.

10

**D.     Touvell Executes a BPA With Towne Park that Is Narrowly Tailored to Protect the Company's Interests.**

51.     On or about December 22, 2016, and in exchange for his continued employment with the Company and additional consideration of $50, Touvell entered into a BPA (or the "Agreement" as used in the document) with Towne Park.

52.     In the BPA, Touvell agreed that for a one-year period following the separation of his employment from Towne Park, that he "will not directly or indirectly, through social media or otherwise, as a proprietor, partner, employee, agent or otherwise:"

> Solicit, request or engage in any conversation or communication with any of the employees, independent contractors or agents of [Towne Park], or of any affiliate of [Towne Park], regarding terminating their employment relationship or other relationship with [Towne Park] and entering into employment with [you] or with any other individual entity. . . .

> [A]ttempt to solicit, or do business with any Customer, Customer contact, prospective Customer, referral source, or agent of any such individual or entity, or any other individual or entity for whom or which [you] performed any service while [you were] employed by [Towne Park], or about whom or which [you] received Confidential Information, including, without limitation by initiating communications, or responding to requests for proposals. . . .

> Take any act to cause, bring about, or induce any interference with, disturbance to, or interruption of any of the then existing relationships (whether or not such relationships have been reduced to formal contracts) with any Customer, Customer contact, Prospective Customer, employee, referral source, consultant, or supplier of [Towne Park] or any of [Towne Park's] affiliated companies. . . .

> Engage in any conversation or other communication that would tend to negatively impact or in any way damage or disparage [Towne Park] or its relationship with any other employees, contractors, vendors, Customers, Customer Contacts, Prospective Customers, referral sources, distributors or other entities with which [Towne Park] comes in contact in the course of the Business. . . .

> Engage in a business in competition with [Towne Park] in the Restricted Territory, providing any service that [you] provided on behalf of [Towne Park].

*See* Touvell's BPA, attached as Exhibit A at § 4.

53.     In addition, Touvell agreed that he "will not at any time during [his employment

with Towne Park], and for so long thereafter as the pertinent information or documentation

remains confidential, use or disclose to others . . . any Confidential Information, except in the

course of work for [Towne Park]." *Id.* at § 7.

54.     Touvell also agreed that "the obligations [described above] are reasonable and

necessary to protect [Towne Park's] Business, and do not unreasonably restrict [his] ability to

earn a living." *Id.* at § 8.  Moreover, Touvell agreed that he would "show this Agreement to any

prospective employer of [his]." *Id.* at § 12.

55.     The defined terms in the BPA are narrowly tailored to protect Towne Park's

interests without restricting Touvell's opportunity to make a living.  In particular, the key terms

in the above post-employment restrictions are defined as follows:

    a.  Towne Park's "Business" is defined as "professional parking management and
consultant services business and other ancillary services, including, but not
limited to hospital parking, hotel valet parking, event parking, shuttle
transportation, bellhop service, concierge service, remote parking
management, door service, greeter service, patient escorts, and self-parking
management." *Id.* at p. 1 recitals.

    b.  "Confidential Information" is defined as "any and all of Employer's trade
secrets, confidential and proprietary information, and all other information
that is not generally known to third persons who could derive economic value
from its use or disclosure, including, without limitation, the methods through
which Employer identifies, hires, trains and compensates its employees;
details regarding Employer's employees, including their compensation,
contact information, and their performance and conduct; the identity of
Employer's customers; Employer's financial and pricing data or related
information, including, but not limited to, the methodologies used to
determine said data, which Employer considers a trade secret; the individuals,
and their contact information, at customers with whom Employer has dealt;
the services for which customers have contracted, and the terms of those
contracts; the details of any ongoing or planned negotiations for future
services; Employer's plans for the future, including without limitation plans
for its services, for geographic and customer markets, and for marketing,
promoting and distributing its services." *Id.* at § 3A.

c.  "Customer" is defined as "any person or business entity to whom or to which the Employee has directly or indirectly sold or rendered professional parking or other services related to the Business at any time during the Pre-termination Period. For the purpose of this definition, 'directly or indirectly sold or rendered' means services that the Employee sold or rendered personally, and services sold or rendered by individuals who are managed by the Employee. *Id.* at § 3B.

d.  "Prospective Customer" is defined as "any individual or entity who or which Employee has directly or indirectly solicited for business during the Pre-Termination Period, and about who or which Employee received Confidential Information. For the purpose of this definition, 'directly or indirectly solicited' means solicitations that the Employee made personally, and solicitations made by individuals who are managed by the Employee." *Id.* at § 3E.

e.  "Restricted Territory" is defined as "any state in which Employee performed services for Employer in the last year of Employee's employment by Employer. For the purposes of this definition, 'state in which employee performed services' means any state in which Employee's office was located, any state to which Employee traveled and performed work on behalf of Employer, and any state in which Employer has operations over which Employee had responsibilities." *Id.* at § 3H.

56.     Finally, Touvell acknowledged that Towne Park would be entitled to immediate injunctive relief and agreed to reimburse Towne Park for attorney's fees and costs incurred in enforcing the terms of the Agreement should he be found to have breached the terms of the Agreement.  *Id.* at § 15.

**E.     Touvell Resigns From Towne Park and Admits That He Is Joining Propark to Lead Its Healthcare Business**

57.     On or about August 9, 2019, Touvell informed his direct supervisor Stilley by phone, and confirmed via email, that he was resigning from Towne Park, effective August 23, 2019.

58.     In the email, Touvell stated that "I received an offer to serve as a Senior Vice President leading the healthcare vertical for a privately held company."  *See* Resignation Email, attached as Exhibit B.  Touvell later admitted to Stilley that he accepted a position with Propark,

a company that also provides Parking and Hospitality services and is a direct competitor of Towne Park.

59.     Touvell further admitted to Stilley that Propark hired him to "lead and grow" its nationwide healthcare business, which is not as established as Towne Park's healthcare business.

**F.      Propark's Decision to Hire Touvell to "Lead and Grow" Its Nationwide Healthcare Business, Despite His Obligations In His BPA, Poses an Imminent Threat of Irreparable Harm to Towne Park.**

60.     Propark's decision to hire Touvell to "lead and grow" its nationwide healthcare business and Touvell's intention to work for Propark in that capacity give rise to a breach of Touvell's BPA and will result in irreparable harm to Towne Park's business.  In Touvell's prior job as second-in-command for Towne Park's nationwide healthcare business, he developed client relationships and had access to confidential information, including client pricing and contract terms.  Touvell's relationships and knowledge give him and his new employer Propark an unfair and unlawful advantage that will likely harm Towne Park in its efforts to compete with Propark.

61.     First, as an immediate concern, Towne Park is currently bidding against Propark for two potential clients in New York, which is in Touvell's former territory.  Touvell has information relevant to those pending bids and will likely use his knowledge to give Propark an unfair advantage in the bidding process.

62.     Second, Touvell has intimate knowledge of confidential information concerning Towne Park's healthcare business, which would cause irreparable harm to Towne Park if disclosed to a direct competitor like Propark.  For example, Touvell has knowledge of the pricing and contract terms agreed upon with Towne Park's two GPO clients, which could impact around 1/3 of Towne Park's healthcare clients.  Those pricing and contract terms are confidential, not publicly available, and certainly not available to competitors like Propark.  Given that Propark hired Touvell to "lead and grow" its nationwide healthcare business, Touvell will likely use his

knowledge of Towne Park's contract terms with its GPO clients to undercut Towne Park and poach those clients.  That would irreparably harm Towne Park's healthcare business.

63.     Third, Propark touts itself as being a nationwide provider of Parking and Hospitality services.  Touvell will likely use Towne Park's confidential information to unfairly compete with Towne Park not only for the GPO clients, but for all of Towne Park's healthcare clients throughout the country.

64.     Fourth, Touvell possesses confidential and sensitive information on Towne Park's 50 most important clients through his involvement in Project One.  Touvell will likely use such information to give Propark an unfair advantage in its efforts to solicit Towne Park's most important clients in other industries besides healthcare.

65.     Fifth, in addition to using Towne Park's confidential information, Touvell will likely have the opportunity to leverage the relationships and goodwill that he has developed with all of the clients Towne Park assigned to him to solicit those clients from Towne Park.

66.     Sixth, Towne Park has more experience servicing healthcare clients than many companies such as Propark, and that institutional experience and knowledge gives Towne Park a distinct advantage over its competitors in the healthcare industry.  Touvell possesses intimate knowledge of Towne Park's operations in the healthcare business, which he likely will use on behalf of Propark to unfairly compete against Towne Park for future clients.

67.     Finally, Touvell also has knowledge of key sales and operational employees at Towne Park who are high performers and/or possess strong client relationships.  As set forth below, Propark has demonstrated its interest in hiring Towne Park employees.  Touvell will likely use his knowledge to help Propark target more Towne Park employees to recruit.

**G.**     **Propark's Has Hired Other Towne Park Executives With BPAs Besides Touvell.**

68.     Propark is well aware that Towne Park executives like Touvell are bound by reasonable non-competition, non-solicitation, and confidential obligations, but nonetheless proceeded with the unlawful hiring of Touvell.

69.     In early March 2019, Towne Park learned that Propark intended to hire then current Towne Park Vice President of Operations, John Reimers.

70.     As Vice President of Operations, Reimers had direct accountability for Towne Park's business in the Western Region and was responsible for the rRegion's performance for financial, guest/patient satisfaction, client retention, employment practices and business development objectives.  In addition to overseeing Towne Park's operations in the Western Region, he was also responsible for clients that used Towne Park's services nationwide.

71.     Like Touvell, Reimers' job duties for Towne Park gave him access to Towne Park confidential business information, including but not limited to client lists, pricing and contract terms, as well as business and pricing models, methodologies, and strategies.  Also like Touvell, Reimers executed a BPA that contained identical confidentiality, non-solicitation, and non-competition obligations.

72.     After learning that Propark intended to hire Reimers, Towne Park provided written notice to Propark's President on or around March 15, 2019, placing Propark on notice of Reimers' non-solicitation, non-competition, and confidentiality obligations.  At the same time, Towne Park provided a similar letter to Reimers reminding him of his post-employment contractual obligations.

73.     Despite Propark's indisputable knowledge of Reimers' contractual obligations, Propark went forward and hired Reimers to serve as Propark's Chief Operating Officer ("COO").  Moreover, Propark publicized its hire of Reimers on its website, emphasizing and lauding

Reimers' "substantial leadership experience guiding operational divisions at national parking management and transportation solution companies." Propark also publicized that, while serving as Vice President of Operations at Towne Park, Reimers "directed the day-to-day operations of its successful West Coast region." *See* "John Reimers Joins Propark as Company's Chief Operating Officer. " https://www.propark.com/news-articles/johnreimerscoo/ (last visited Aug. 22, 2019).

74.     In addition to Reimers and Touvell, Propark has also hired Towne Park's Manager of Growth and Sales Analytics, Brenda Freije, who was based out of Maryland and resigned from Towne Park on the same day as Touvell.

75.     During her employment with Towne Park, which started in April 2015, Freije was responsible for supporting Towne Park's sales department and sales leadership by managing the creation and analysis of financials and statistics to provide insight and recommendations in the development of sales materials, proposal enhancements, national client account oversight, and pricing development efforts.

76.     Freije was a key employee who was privy to confidential information regarding Towne Park's confidential pricing and forecasting methodologies, and business strategies for growth.

77.     Freije also had access to confidential information on all of Towne Park's current clients, including sensitive information on the revenue earned from each client, as well as the pricing and contract terms applicable to each client.  Like Touvell and Reimers, Freije was also subject to a BPA that contained confidentiality, non-solicitation, and non-competition obligations.

**H.      Propark, Reimers, Touvell and Freije Fail to Provide Substantive Responses to Letters from Towne Park.**

78.     Upon learning that both Touvell and Freije intend to work for Propark, Towne Park promptly sent Propark a letter on August 15, 2019 that put Propark on notice of Freije and Touvell's non-compete, non-solicitation, and confidentiality obligations owed to Towne Park. The letter also requested that Propark respond by August 22, 2019 to address the following:

   a.   Explain how Reimers can hold the position of COO for Propark without being in breach of his non-competition, non-solicitation, and confidentiality obligations set forth in Section 4 of his BPA, or confirm that Propark will transfer Reimers into a different position in which he would not be in breach of his obligations under the BPA;

   b.   Confirm that Propark has instructed Reimers to comply with all of his obligations to Towne Park as set forth in his BPA;

   c.   Return any Towne Park documents or materials containing Towne Park's Confidential Information to Towne Park immediately, or confirm that no such documents or materials are in Propark's possession;

   d.   Confirm that Propark will immediately withdraw the employment offers made to Touvell and Freije given the restrictions in their BPAs; and

   e.   Confirm that Propark will refrain from hiring any other Towne Park employee subject to contractual post-employment non-competition obligations to Towne Park (whether through a BPA or similar contract).

A true and correct copy of the August 15, 2019 letter sent to Propark is attached as Exhibit C.

79.     Towne Park also sent similar letters to Reimers, Touvell, and Freije on August 15, 2016.  A true and correct copy of the August 15, 2019 letters sent to these individuals is attached as Exhibit D.

80.     All four letters were delivered to their intended receipts via Federal Express on August 16, 2019.

81.     On August 23, 2019, Propark's counsel responded to the letters by asking for more time to evaluate Towne Park's position, but failed to provide any assurances that Propark would honor the obligations in Reimers, Touvell, and Freije's BPAs.

**COUNT I (AGAINST DEFENDANT TOUVELL)**
**BREACH OF CONTRACT**

82.     The preceding paragraphs are incorporated by reference as if fully set forth herein.

83.     The BPA signed by Touvell is valid and enforceable as written because it meets Maryland state contract law requirements, it reasonably protects and advances Towne Park's legitimate business interests, and the balance of the equities favors enforcement of his BPA.

84.     Touvell continues to be bound by his BPA.

85.     By the conduct described above, Touvell has materially breached the express provisions of his BPA, including but not limited to Sections 4 and 7 of the BPA.

86.     As a direct and proximate result of Touvell's breach of contract, Towne Park has suffered, and will continue to suffer, immediate irreparable harm unless Touvell is enjoined as requested below.

87.     Greater injury will be inflicted on Towne Park by the denial of this relief than will be inflicted on Touvell by granting of this relief.

**COUNT II (AGAINST DEFENDANT PROPARK)**
**INTENTIONAL/TORTIOUS INTERFERENCE**
**WITH CONTRACT**

88.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

89.     Towne Park's BPA with Touvell is an enforceable contract entered by the parties for valid consideration.

90.     Propark intentionally solicited and employed Touvell despite knowing that doing so would interfere with the contractual obligations agreed to in his BPA with Towne Park.

91.     But for Propark's tortious interference, taken without justification, Touvell's BPA would not have been breached.

92.     The foregoing tortious conduct was authorized, ratified, or consented to by managerial employees of Propark.

93.     As a direct and proximate result of Propark's tortious conduct, Towne Park has suffered, and will continue to suffer, immediate and irreparable harm unless enjoined.

## **PRAYER FOR RELIEF**

WHEREFORE, Towne Park requests the following relief:

(a)     That Touvell be enjoined, preliminarily until hearing, and thereafter for one year following the entry of the Court's Order, from working for Propark;

(b)     That Touvell be enjoined, preliminarily until hearing, and thereafter permanently, from any further breaches of his BPA;

(c)     That Propark be enjoined, preliminarily until hearing, and thereafter for one year following the entry of the Court's Order, from employing Touvell or otherwise contracting with Touvell to provide services to Propark;

(d)     That Propark be enjoined preliminary until hearing, and thereafter permanently, from employing or retaining any Towne Park employees or former employees in a position that would give rise to a breach of Towne Park's Business Protection Agreement with that employee;

(e)     That Towne Park be awarded actual and compensatory damages, pre-judgment and post-judgment interest, and reasonable attorneys' fees and costs, including, but not limited to, all costs of the investigation into Defendants' unlawful actions; and

(f)     That Towne Park be awarded such other and further necessary and proper relief as the Court may deem just and proper.

Dated: August 27, 2019                    Respectfully submitted,

                                          /s/ *Lincoln O. Bisbee*
                                          Lincoln O. Bisbee (Bar No. 28953)
                                          MORGAN, LEWIS & BOCKIUS LLP
                                          1111 Pennsylvania Avenue, N.W.
                                          Washington, DC 20004
                                          Tel:    (202) 739-3000
                                          Fax:    (202) 739-3001
                                          lincoln.bisbee@morganlewis.com

                                          Joseph J. Costello (*pro hac vice* application pending)
                                          Morgan, Lewis & Bockius LLP
                                          1701 Market Street
                                          Philadelphia, PA  19103
                                          Tel:   (215) 963-5000
                                          Fax:   (215) 963-5001
                                          Joseph.costello@morganlewis.com

                                          *Attorneys for Plaintiff*
                                          Towne Park, LLC